[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, George Feifer, age 59, and the defendant Tatyana Feifer, age 50, whose maiden name was Tatyana M. Leimer, were married in Moscow, Russia, on August 19, 1969.
There are two children born of this marriage, Gregory Feifer, age 22, who is a senior at Harvard College, and Anastasia Feifer, age 16, who is a sophomore at Concord preparatory school in Massachusetts. Both these children live with the plaintiff in the marital home in Sharon, CT when school is not in session.
The court characterizes this marriage from 1969 to August of 1990 as reasonably harmonious but lacking in generous and unselfish love. It appears that the parties lived as two individuals, rather than as a unit, and that both were self-indulgent, to the detriment of the other and to the marriage.
At the time of the marriage, the defendant was a Russian citizen, living in Moscow, and the plaintiff an American author, lived in London, long a preferred haunt CT Page 966 of the literati.
Shortly after their marriage, the defendant left Russia, and the parties lived in London for approximately nine years. In 1980 they moved to Connecticut, at least partially because of the plaintiff's actual or potential contretemps with the English counterpart of the Internal Revenue Department.
Although there was no evidence of what schools the plaintiff attended or what degrees he holds, it is obvious that he is very well educated and highly intelligent. The defendant, by dint of hard work since she left her native land, has earned both a Bachelor and Master's degree and is a teacher of Russian at Vassar College, a well regarded college in Poughkeepsie, New York. Both parties have worked throughout the marriage, the plaintiff as a self-employed author, lecturer and journalist; and the defendant in a variety of jobs, ranging from a supermarket clerk to college professor. At all times family income has been rather sparse and sporadic relative to family lifestyle, and as best as the court can determine, has been maintained by occasional injections of the plaintiff's substantial pre-marriage assets, by assistance from friends, and by effective use of mirrors.
In the 1980's, the defendant ventured into her own business of handbag manufacture, which was fairly successful for a few years, but foundered for a variety of reasons beyond the defendant's control. The defendant started her handbag business in 1983, assisted by a second mortgage on the marital home in Sharon, which was built in 1981, a year after the family moved to Connecticut from London. Construction of that home was made possible by the money the plaintiff had prior to the marriage, although the parties had been married twelve years by that time. In approximately 1985, the plaintiff inherited $33,500.00 which he applied to reduce the principal balance owed on the first mortgage on the family home, which was obtained so the parties could build a house in Spain.
In 1986, the defendant asked the plaintiff if he would be agreeable to taking out an equity credit loan in CT Page 967 order to wipe out this second mortgage, which had a higher interest rate than the equity loan, and also to provide money for the defendant's handbag business. The plaintiff assented and a closing took place in December, 1986, which extended a credit line of $100,000.00, secured by a new second mortgage on the Sharon home. The plaintiff insisted that the only way money could be drawn from this account would be by checks signed by him alone, and the loan closed on that basis. At closing, $22,575.77 was disbursed, which included a $14,479.88 payoff of the original second mortgage, and $7,200.00 to friends who had loaned money to the defendant.
The defendant knew that the plaintiff's signature was required on any check to withdraw money from this equity credit line, but when the bank sent out the checks, the names of both parties were typed on them. After a few months, the defendant, knowing full well that the plaintiff's signature was required, started making withdrawals, using the typed checks, and signing her name only. The woefully inept bank, oblivious to the fact that the plaintiff's necessary signature was missing, honored the defendant's checks for several years. The plaintiff had no idea that the credit extended was climbing steadily into what, for this family, was the financial stratosphere. It appears that even her purchase of a brand new SAAB car in March, 1990 did not alert him to the possibility of skullduggery. He assumed that no checks were being used since he wasn't writing any, and he and the defendant had agreed that she would make the monthly payments, so he paid no attention to the monthly statements. He fortuitously discovered what the defendant had been doing behind his back, in August, 1990, when he opened a monthly statement letter from the bank, in the defendant's absence. To his astonishment, the amount owed was almost $100,000.00. When he confronted the defendant, she said nothing, packed her bags, and left home, never to return.
There was considerable evidence of what the defendant did with all this ill-gotten gain, and it is fair to say that she used some in her business, some to pay necessary family expenses, and some for her personal purchases. Not surprisingly, since they were unable to keep up with what were now huge monthly payments, legal CT Page 968 action was brought to foreclose this equity credit line mortgage. The amount owed was $108,000.00 at that time, which had increased to about $133,000.00 at the time the case was settled in December, 1993. The Bank sought from the plaintiff only the $22,757.77 disbursed at the closing plus interest and an attorney's fee.
The foreclosure action was settled for $42,500.00 and the plaintiff withdrew his counterclaims wherein he alleged the Bank improperly allowed the defendant to withdraw money from the account. Most of the money for this settlement came from a Swiss bank account the plaintiff had, which he did not list on early affidavits filed in this court. About $6,000.00 came from his IRA account. The plaintiff incurred a $10,000 bill for his attorney's fee in the foreclosure action.
The parties have a home in Spain which is worth about $500,000.00, but due to the vagaries of Spanish law, they will not receive legal title to the property until they pay approximately $80,000.00 which they owe on this home.
The parties' two children are beneficiaries under the will of the plaintiff's stepfather, whose estate is pending in New York. A recent partial distribution was made, $12,500 to Gregory and $10,000 to Anastasia, but the $10,000 to Anastasia has to be retained by the executor or a trustee until she reaches 21, unless the executor or trustee makes a discretionary payment to the custodial parent, to be used for Anastasia's education or support. The school she attends costs about $22,000 per year.
Based on their financial affidavits, the plaintiff's weekly earnings are $434.00 per week (plaintiff's testimony was that the $428.00 figure on his affidavit should be $434.00), and the defendant's weekly earnings are $333.00 from her employment as a teacher at Vassar College. Her status there is uncertain, because, as of the last trial date, January 19, 1994, not enough students had signed up for her course for the second semester. However, she testified that she still has a job there unless the school contacts her and cancels it. Although the defendant left home by herself in August, CT Page 969 1990, she did not pay any child support to the plaintiff until April of 1993, when she was ordered by the court to pay $90.00. As of January 12, 1994, she was in arrears in the amount of $1,710.00.
The parties are jointly liable under a promissory note in the amount of $9,500.00 for room, board and tuition incurred by Gregory at Kent School (high school).
After considering all the evidence of the trial, both oral testimony and the exhibits, in conjunction with the statutory criteria of Conn. Gen. Stat. 46b-81, et seq., and having evaluated the credibility of the witnesses, the court finds that the marriage has broken down irretrievably and makes the following orders:
1. A dissolution of marriage.
2. The defendant shall pay child support in the amount of One Hundred Four Dollars ($104.00) per week until Anastasia reaches the age of eighteen. Both parties shall provide to the other evidence of their income upon reasonable request and a copy of their individual Federal Income Tax Return, as well as corporate and partnerhsip [partnership] tax returns where applicable.
3. Custody of Anastasia is awarded to the plaintiff, subject to reasonable visitation rights in the defendant. Since Anastasia is sixteen years old, the court expects that considerable deference will be paid to her wishes in this matter.
4. The parties will pay each other the sum of $1.00 per year as alimony.
5. Property in Ibiza, Spain is awarded to the parties in equal shares, and they shall share equally in all rights, benefits, assets, liabilities, expenses, and income, arising out of their interest in this property. Any transactions undertaken by either party relative to this property, unless of an emergency nature, shall be fully disclosed and discussed with the other, prior to effectuation. Each party shall provide the other with an annual accounting of any transactions entered into. CT Page 970
6. The marital residence on Lambert Road, Sharon, CT shall be immediately listed for sale with a mutually agreeable listing agent, at a mutually agreeable price. The court retains jurisdiction over any dispute involving the listing agent, the listing price and the sales price. After deducting customary and reasonable expenses of sale, the net proceeds are to be split equally. Prior to sale, plaintiff shall have exclusive occupancy and control of said property. Any rental income received by the plaintiff shall be applied to the mortgage and maintenance expenses. The plaintiff shall maintain a separate bank account for all rental income received for the property, and render an accounting at the time of sale, at which time any profit or loss will be divided equally and added or subtracted from the parties' respective share of the net proceeds.
6. At the time of sale of the Sharon home, all personal property located there will be divided equally. If the parties cannot agree on how this will be accomplished, the personal property is to be sold and the proceeds divided equally.
7. From the defendant's 50% share of the net proceeds from the sale of the Sharon home, she shall pay to the plaintiff the following sums:
 a. $17,500.00 representing partial reimbursement for the cost of settlement of the foreclosure action and the attorney's fee for defense of that action.
 b. $1,710.00 child support arrearage plus $90.00 per week from the date the $1,710.00 was computed to the date of this decision.
 c. $255.00 representing 50% of unreimbursed medical expenses for Anastasia.
 d. $6,500.00 representing weekly child support from June 1991 to April 19, 1993, when the court CT Page 971 entered a child support order. This order is made pursuant to Conn. Gen. Stat. 46b-215.
8. The parties shall obtain medical and hospital insurance for the benefit of Anastasia, and shall share equally in the cost of that insurance and in the cost of unreimbursed medical, dental, optical, orthodontic, and prescription expenses incurred on behalf of Anastasia.
9. From the funds presently on deposit in Fidelity Funds, the plaintiff shall pay the parties' joint debt to the Kent School and the present debt to Concord Academy for Anastasia's attendance there. The balance of these funds are to be divided equally.
The court is not requiring either party to contribute to the cost of future private education for Anastasia.
10. The parties shall retain ownership of their respective automobiles.
11. As to any liability listed by the parties on their financial affidavits filed in January, 1994, each party shall be responsible for their own liabilities, except for any such liabilities that are dealt with in another part of this memorandum of decision. Each party shall indemnify and hold the other harmless on these liabilities.
RICHARD A. WALSH, J.